*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 08-79-P-H* |
| | ) | |
| *JOSHUA BACH,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Joshua Bach, charged with knowingly possessing a computer and other digital storage media that contained images of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A), *see* Information (Docket No. 2), moves to suppress statements made by him to law enforcement officers and evidence seized from his residence in Buxton, Maine, on or about August 24, 2004, *see* Motion To Suppress Evidence ("Motion") (Docket No. 12) at 1.  An evidentiary hearing was held before me on July 24, 2008, at which the defendant appeared with counsel.  The government offered one exhibit, admitted without objection, and called one witness.  The defendant introduced six exhibits, also admitted without objection, testified on his own behalf and recalled the government's witness.  At the close of the evidentiary hearing, counsel for both the defendant and the government argued orally.  I now recommend that the following findings of fact be adopted and that the Motion be denied.

**I. Proposed Findings of Fact**

At about 4 p.m. on August 24, 2004, Immigration and Customs Enforcement Agency ("ICE") special agents Douglas McDonnell and Stephen Madden approached the residence of the

1

defendant, Joshua Bach, in Buxton, Maine, to engage in what is colloquially known as a "knock and talk." Among ICE's duties is the investigation of child pornography crimes. As a result of a nationwide child pornography investigation nicknamed "Operation Falcon," the Newark, New Jersey, ICE office had obtained lists of individuals suspected of purchasing memberships to internet web sites containing child pornography. Through that investigation, the Newark ICE office had determined that a credit card issued in the defendant's name had been used to purchase access to such a site. In October 2003, the Newark ICE office had passed that information, along with the defendant's street address, e-mail address, internet protocol address, credit card number, and the name of the web site accessed, to its counterpart office in Portland, Maine.

McDonnell, of the Portland ICE office, followed up on this lead by issuing customs summonses to the credit card issuer and the internet service provider identified by the Newark ICE office. On or before January 2004, he was able to corroborate that the e-mail address and credit card in question were listed to the defendant. Because of the press of other investigative business, however, the investigation lay dormant until August 2004. As of that time, McDonnell believed that he lacked probable cause to obtain a warrant to search the defendant's computer. Accordingly, he and Madden approached the defendant's residence on the afternoon of August 24, 2004, with the purpose of engaging him in conversation and, ultimately, obtaining his consent to such a search.

After parking their vehicle in the defendant's driveway, the agents, clad in polo shirts and khaki pants or dungarees, with weapons visibly holstered at their belts, approached the residence and knocked on a side door. A gentleman opened it. The agents identified themselves by name, title, and display of credentials, and asked if they could speak to Joshua Bach regarding an

2

investigation that they were conducting. The gentleman at the door said that he was Joshua Bach, and invited the agents inside.[1] The defendant had observed the agents' white Ford Taurus, which he at first mistakenly thought was the vehicle of a friend, pulling up into his driveway. Later in the interview, the thought crossed his mind that the agents' vehicle was blocking his, although he probably could have driven around it if he had been inclined to do so.

The defendant led the officers to the living room area of his small, single-story house. McDonnell and Madden sat on a couch, while the defendant sat in a chair facing them.[2] McDonnell took the lead in questioning the defendant, while Madden took handwritten notes. McDonnell informed the defendant that he had information that the defendant's credit card had been used to purchase membership to pornographic web sites.[3] He asked if the defendant knew what he was talking about. The defendant replied that he had seen, on a credit card statement, a charge with which he was not familiar from a web site having to do with Russian models. He said that he had contested the charge, and the credit card issuer had agreed to remove it. The defendant then mentioned that he had purchased a membership to a web site called "VLAD" but had never received an appropriate log-in or password, as a result of which he complained to his credit card issuer and received a credit for the charge. He said that he had also purchased a membership to another site that featured models, "Club 17," but had canceled it after one month.

---

[1] At hearing, the defendant testified that McDonnell and Madden did not identify themselves by their full names, titles, or display of credentials, with McDonnell merely stating, "I'm Doug and this is Steve, and we need some information about a credit card." I credit McDonnell's version of the initial encounter over that of the defendant. McDonnell testified that it is standard practice at ICE for agents to identify themselves by name, title, and display of credentials, not only for the benefit of the individuals with whom they speak but also for their own safety, so that they are not perceived as unknown individuals armed with guns. In any event, the defendant testified that he surmised as he stood in the doorway that McDonnell and Madden were law enforcement officers because they were wearing holstered handguns.

[2] The defendant is five feet 10 inches tall and weighs 175 pounds. McDonnell is six feet tall and weighs 190 pounds. Madden is five feet seven inches tall and weighs 175 to 180 pounds.

[3] McDonnell agreed on cross-examination that he had made a strategic choice not to inform the defendant of the subject matter of his investigation at the door to maximize the chance of eventually obtaining his consent to search.

McDonnell asked whether anyone else had access to the defendant's credit cards or e-mail. The defendant said that no one else did.

McDonnell quizzed the defendant about his computer and his internet service provider. The defendant responded that he had purchased his computer in July 2002 and that he received internet service through Saco River Telephone. He said that he primarily used his computer for school work, e-mail, and other paperwork.

McDonnell questioned the defendant about his background. The defendant said that he had attended the University of Southern Maine in Gorham, had lived at his current address for 16 years, was divorced, and worked as a teacher at a school in Buxton for students ages 14 to 18 with behavioral problems. He told McDonnell that he had been a teacher for 10 years and taught a variety of subjects, including English and art. He said that he also worked on occasion assisting a friend in repairing automobiles and had worked at an inn.

While conversing in the living room with agents, the defendant began to express concerns. He told McDonnell that he was strict with himself but, on occasion, would receive pop-up advertisements containing shocking images. He also mentioned that he did not know if images on the VLAD web site were legal. McDonnell asked him whether he had viewed content depicting children. The defendant claimed to have seen no specific reference to children and to have viewed only their faces. He told McDonnell that all web sites that he had visited had disclaimers indicating the individuals depicted were over age 18.

At approximately 4:30 or 4:35 p.m., McDonnell asked the defendant whether he and Madden could look at his computer. McDonnell said that he had concerns about the defendant's computer being used to access these sites, and that, for his and Madden's peace of mind, he wished to search the computer. The defendant said that was OK with him. As of that point,

4

McDonnell did not believe that he had probable cause to search the defendant's computer. He had no knowledge about whether any of the web sites that the defendant had mentioned depicted children.

The defendant led McDonnell and Madden down a hallway to a bedroom containing a bed, a chair, and a table on top of which were placed a computer, monitor, printer, and scanner. The defendant mentioned that he was unsure whether some recent downloads were legal or not, but stated that, once McDonnell and Madden viewed them, they could tell him whether they were. The defendant sat in the chair and logged on to his computer, possibly at McDonnell's request.[4] A screen containing wallpaper depicting a coastal scene appeared. McDonnell then presented the defendant with ICE's standard consent form for computer searches, titled "Permission to Search Computer." *See* Gov't Exh. 1. The search form states, in part:

> It is the intent of the forensic examiner and agents of the Department of Homeland Security/Immigration and Customs Enforcement to search only for child pornography. Child pornography being loosely defined as images, video clips, or visual depictions of children under the age of eighteen engaged in adult sexual activities. Should no child pornography be located on the hard drive or other duplicated media/electronic equipment, submitted for examination, then the imaged hard drive will be sanitized and erased of any data.
>
> I am giving this written permission to these officers freely and voluntarily, without any threats or promises having been made, and after having been informed by said officer(s) that I have a right to refuse this search and/or seizure.

*Id.*

The defendant read the form. He asked McDonnell whether he had to provide his consent for the search. McDonnell said that he did not. The defendant asked what would happen if he did not consent. McDonnell responded that, if he (McDonnell) were in a similar position and had nothing to hide, he would allow agents to conduct a search. McDonnell

---

[4] The defendant testified that McDonnell told him to turn on the computer and log on. McDonnell did not recall whether he asked the defendant to do so or whether the defendant simply did so.

5

explained the procedure that he would use to conduct the search, noting that he would run software on the defendant's computer that would display images from it.

The defendant said that he wished to cooperate in the investigation but did not know if the images he had seen were legal. He divulged that his computer contained images of nude children, but none in which children were engaging in sexual activities.[5] He explained that he had conducted some research into the definition of child pornography but had been unsuccessful in obtaining a clear definition. McDonnell informed the defendant that child pornography was defined under federal law to include the lascivious display of the genitals of a child under age 18. The defendant said that his computer contained images of naked children probably between ages 12 and 13 displaying their genitals. He explained that he had not been forthcoming about this earlier in the interview because he had been embarrassed. He said that he felt terrible about the images. He told McDonnell that images were contained in a My Pictures sub-folder called POO1 or PO1. He estimated there were between 1,500 and 1,800 images. Following these admissions, which were made at about 5:00 or 5:05 p.m., McDonnell believed that he had probable cause to search the defendant's computer. If, after that point, the defendant had asked agents to leave, they would not have done so but rather would have secured the computer in the residence pending application for a search warrant. The defendant, on the other hand, would have remained free to leave, so long as he left his computer there.

The agents revisited the issue of written consent with the defendant. The defendant again asked McDonnell if he had to provide consent to the computer search. McDonnell told him that his consent had to be freely and voluntarily given. The defendant inquired what would happen if child pornography were found and whether he would be sent to jail. He expressed concern about

---

[5] The defendant testified that he was not sure after reading the definition of child pornography contained in the consent form that his images would qualify as such because he had no images of people under 18 engaging in "sexual activities."

6

his parents, explaining that they were in ill health and that he was their primary caregiver. McDonnell assured the defendant that he would not be taken into custody that day, advising him that he and Madden were there as criminal investigators and that, depending what they discovered, the defendant might be liable for federal criminal prosecution. McDonnell then summarized the content of his interview with the defendant and advised him that he believed that, based on what the defendant had told him, there were images of child pornography located on the defendant's computer. The defendant nodded his head in apparent agreement.

The defendant then said words to the effect that agents would do what they had to do. He again asked what would happen if he did not provide consent. McDonnell told the defendant that he did not have to provide consent to look at his computer but that, if he did not consent, McDonnell would contact the United States Attorney's Office and apply for a search warrant, during which time agents would secure the computer at his residence.[6] McDonnell reiterated that the defendant's consent had to be freely and voluntarily given. The defendant inquired about whether McDonnell knew what crime he might be charged with, what the punishment would be, and the time frame for any prosecution. McDonnell advised that the crime would be possession of child pornography but that he did not have answers to the other questions, saying things had to be taken one step at a time. The defendant said words to the effect, "You have to do what you have to do." He requested a pen. McDonnell asked the defendant whether he was clear as to what the consent form covered. The defendant said that he was. At approximately 5:20 p.m., the defendant signed the form.[7]

---

[6] The defendant testified that, in response to his question regarding what would happen if he did not sign the consent form, McDonnell stated, "We secure the computer and go get a search warrant," which the defendant understood to mean that he had no choice, regardless of whether he signed the consent form or not. While the defendant insisted that he remembered this statement as if it were today, I credit McDonnell's testimony that he said that agents would "apply for" a search warrant. McDonnell's version of this conversation, about which he was equally sure, comports with Madden's contemporaneous handwritten notes. *See* Defendant's Exh. 2 at 5.

[7] The defendant testified that he did not understand that he was waiving his constitutional rights by signing the

After the defendant signed the form, McDonnell began running pre-search software. Once the program was running, McDonnell also signed the consent form, dated it and noted the time when he signed it, 17:30, or 5:30 p.m. *See id*. That is the sole time noted on the form. *See id*. Neither Madden's contemporaneous notes nor McDonnell's report, prepared shortly after the encounter, indicate the time at which the defendant signed the form. *See* Defendant's Exhs.1-2.[8]

While the program was running, the defendant went into the living room to hand-roll a cigarette, returned to the bedroom, and smoked it.[9] Madden followed the defendant into the

---

consent form, that the agents did not explain the form but just directed him to sign it, and that he did not give his consent freely and voluntarily. I am satisfied, from the evidence as a whole, including the defendant's background and intelligence, the wording on the form itself, and the many questions he asked agents, to which essentially accurate responses were provided, that he was effectively apprised that he had a right to refuse consent, and that if he did so, agents would be obliged to obtain a search warrant to search the computer.

[8] At oral argument, defense counsel contended that the evidence showed that McDonnell began running the pre-search program prior to obtaining the defendant's signature on the consent form. He argued that it strained credulity that McDonnell, a trained agent who understood the importance of accurate record-keeping in a warrantless search, would have neglected to note the critical detail of the time the defendant signed the consent form, instead noting the immaterial fact of the time he (McDonnell) signed it. Hence, defense counsel reasoned, the time reflected on the form, 5:30 p.m., can only reasonably be construed as the time that the defendant signed it. He pointed out that this, in turn, was 10 minutes after the time McDonnell, by his own report, began running the search software at 5:20 p.m. He further underscored that the defendant had testified that, by the time he finally signed the consent form, the search program was running. I am satisfied, on the totality of the evidence, that no search was commenced until after the defendant signed the form. The defendant did testify on redirect examination, in response to the question whether there was any doubt in his mind that the disc the agent placed in the computer was running before he (the defendant) signed the consent form: "No, there isn't any doubt." Nonetheless, his testimony on direct examination indicated otherwise. The defendant then testified that, after he logged on to his computer, McDonnell directed him to sit on the bed, and McDonnell sat in the chair, opened the computer's compact-disc tray, and, while holding a disc in his hand, told him, "Before I look at it, I need you to sign this consent form. Read it before you sign it." The defendant testified that, as of the time he signed the consent form, McDonnell had put the disc in the tray, but he (the defendant) did not recall whether the tray was open or closed or the program was running. Further, when McDonnell was asked on direct examination whether he had begun running the program before obtaining the defendant's signed consent, he testified: "Absolutely not." Asked why he was so sure, he explained that his and Madden's primary goal was to obtain the defendant's consent to search the computer, and that was the purpose of clarifying for the defendant what consent meant and actually having him sign the form. Finally, McDonnell's report, prepared within a few days of the knock and talk, indicates that, while he ran the software at approximately 5:20 p.m., he did so after the defendant had signed the consent form. *See* Defendant's Exh. 1 at 10.

[9] The defendant testified that after he signed the consent form, when he was halfway through smoking his cigarette, McDonnell told him, "There are only me, you and Steve here. You can say whatever you want." He also testified that Madden took no notes whatsoever while he was in the bedroom, and that, whether intentionally or not, Madden was standing in a position that blocked the defendant from leaving the bedroom. I do not find the defendant's testimony concerning McDonnell's comment or Madden's note-taking credible. At the time McDonnell allegedly made this comment, he had already taken numerous statements from the defendant and had obtained his consent to search the computer. He would have gained nothing by making such a remark. A review of Madden's handwritten notes makes clear that he continued to take detailed notes while in the bedroom. *See* Defendant's Exh. 2. While Madden may have been standing near the door of the small bedroom, he did not bar the defendant from leaving that room to roll a cigarette.

living room and back into the bedroom, but did not restrict his movements. McDonnell and Madden identified several images displayed during the search as fitting the description of child pornography. The defendant told the agents that there might be videos as well, although he did not know if they were legal and wished someone had told him. McDonnell and Madden wrote down file names of images they believed contained child pornography and stopped the search program at approximately 5:40 p.m. *See* Defendant's Exh. 1 at 10; Defendant's Exh. 2 at 6. They powered down the computer, seized it, and, at 5:50 p.m., issued the defendant a receipt. *See* Defendant's Exh. 4. They told him that they would be in touch with him and left with his computer.

The tone throughout the agents' visit to the defendants' home was businesslike. The defendant, who is 54 years old and has a bachelor's degree, appeared to McDonnell to be able to communicate intelligently and understand the substance of the conversation.[10] At no time did the agents restrict his freedom of movement, refer to their weapons, or tell the defendant he was in custody. At no time did the agents administer to the defendant a warning pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).[11]

## II. Discussion

The defendant acknowledges that "knock and talk" encounters between citizens and the police ordinarily are consensual, and have been upheld as legitimate, absent circumstances indicating otherwise. *See* Motion at 10-11; *see also, e.g., United States v. Jerez*, 108 F.3d 684,

---

[10] The defendant gave the same impression while testifying at hearing. He spoke well and showed no apparent difficulty comprehending questions asked of him. He agreed on cross-examination that he had at least an average command of English, understanding of the written word, and ability to read and write, and was of at least average intelligence. He is able to prepare and file his federal tax returns, pay municipal and state taxes, manage a home budget, and has no difficulty navigating the affairs of everyday life.

[11] Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

691-92 (7th Cir. 1997) (officers' persistence in knocking on door of motel room in middle of night for three full minutes, shining flashlight into room, and commanding that sleeping occupants open door, "transformed what began as an attempt to engage in a consensual encounter into an investigatory stop"); *United States v. Ponce Munoz*, 150 F. Supp.2d 1125, 1133 (D. Kan. 2001) ("A knock and talk is ordinarily consensual unless coercive circumstances such as unreasonable persistence by the officers turn[] the encounter into an investigatory stop. The court recognizes that other factors, such as a display of weapons, physical intimidation or threats by the police, multiple police officers questioning the individual, or an unusual place or time for questioning may transform a consensual encounter between a citizen and a police officer into a seizure.") (citations omitted); *United States v. Powell*, 929 F. Supp. 231, 232 n.3 (S.D. W.Va. 1996) ("A 'knock and talk' occurs where the officer (1) visits the residence, (2) identifies himself, (3) asks to be admitted to the house, and (4) then seeks consent to search. The utility of this procedure to law enforcement is obvious: It avoids the necessity of securing a search warrant from a judicial officer. While the potential for abuse is apparent, courts and commentators appear to concur that the practice can be lawful.") (citations omitted).

Nonetheless, in this case, the defendant argues, agents crossed the line, transgressing his Fourth Amendment rights by performing a warrantless search of his computer without his voluntary consent, and violating his Fifth Amendment rights by eliciting incriminating statements from him involuntarily and in the absence of *Miranda* warnings. *See* Motion at 11-12; Response to Government's Objection to Motion To Suppress Evidence ("Reply") (Docket No. 24).[12] The government bears the burden of proving (i) *Miranda* compliance, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), (ii) the voluntariness of a

---

[12] In his Motion, the defendant invoked the Fourth, Fifth, and Sixth Amendments to the United States Constitution. *See* Motion at 1. He later withdrew any Sixth Amendment claim. *See* Reply at 2.

10

confession, *see, e.g., United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990), and (iii) the lawfulness of warrantless searches and seizures, s*ee, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992). For the reasons that follow, I conclude that it has carried that burden with respect to the computer search and statements in issue here.

### A. Admissibility of Fruits of Computer Search

"[W]arrantless search and seizures in the home violate the Fourth Amendment, absent consent or exigent circumstances." *United States v. Weidul*, 325 F.3d 50, 53 (1st Cir. 2003) (citation and internal quotation marks omitted). "[C]onsent may be express or inferred from conduct." *United States v. Winston*, 444 F.3d 115, 121 (1st Cir. 2006). "Valid consent renders a warrantless search constitutionally permissible, and while consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it." *United States v. Perez-Montañez*, 202 F.3d 434, 438 (1st Cir. 2000). "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given; there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." *Id*. (citation and internal quotation marks omitted).

"Voluntariness turns on a number of factors, including the person's age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Coraine,* 198 F.3d 306, 309 (1st Cir. 1999) (citation and internal quotation marks omitted). "The court can also consider whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *Id.* (citations and internal quotation marks omitted). "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion,

11

express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Mares*, 428 F.3d 64, 67 (1st Cir. 2005) (citation and internal punctuation omitted).

At hearing, defense counsel argued that his client did not freely and voluntarily consent to the search of his computer on August 24, 2004, but rather simply acquiesced in the agents' claim of lawful authority, given that (i) agents commenced the search prior to obtaining the defendant's signature on the written consent form, (ii) agents were armed and appeared to be blocking his egress from the bedroom and the house, (iii) McDonnell directed the defendant to start up the computer and to sit on the bed, (iv) Madden followed him out to the living room when he went to roll a cigarette, (v) he was questioned for a protracted amount of time, one hour and 20 minutes, before agents ran the pre-search software, (vi) McDonnell told him that, if he were in his shoes, he would let agents search the computer, rather than advising him that he had an absolute right to refuse consent, and (vii) McDonnell told him that if he did not consent, agents would get a search warrant, causing the defendant to conclude that he had no choice. *See also* Motion at 11-12; Reply.

Counsel for the government rejoined that it had succeeded in establishing that the defendant was apprised of his right to refuse consent, and freely and voluntarily consented, given the existence of the written consent form itself, the language of that form, its execution prior to the search, the defendant's age, intelligence, education, and language ability, his cooperative attitude during the encounter, the businesslike and calm tone of the encounter, and the lack of any physical punishment, restriction on the defendant's movement, or other coercive police behavior. He posited that the length of the interview prior to the search was not excessive,

particularly given that the time was spent in calm conversation, first in the living room and then in the bedroom.

      I agree that the government has met its burden of showing that the defendant freely and voluntarily consented to the search of his computer on August 24, 2004.  The defendant, a well-educated, intelligent middle-aged man, permitted the two agents to enter his house at approximately 4 p.m., and engaged in a businesslike conversation with them for 30 or 35 minutes before McDonnell asked to see the computer for the agents' "peace of mind."  The defendant readily agreed and led the agents to the bedroom in which the computer was located.  While the agents were visibly armed, they never threatened the defendant with their firearms or raised their voices.  Nor did they restrict his freedom of movement in any appreciable manner.  Even if, as the defendant testified, McDonnell told him to log on to his computer and to sit on the bed after he had done so and Madden was standing between him and the bedroom door, the defendant felt free to leave the room to roll a cigarette.  Madden may have followed him as he did so, but did not restrict his movements.

      When McDonnell presented the defendant with a written consent form, he advised the defendant to read it before he signed it, and the defendant did so.  The form clearly stated that the defendant had a right to refuse the search and that he was providing his consent freely and voluntarily.  Before deciding whether to sign, the defendant probed these concepts further with McDonnell, asking twice whether he had to consent and what would happen if he did not, seeking clarification of the definition of child pornography, and trying to ascertain what harm would befall him, both immediately and in the long-term, if such images were found on his computer.

McDonnell fielded these questions in a straightforward manner. He advised the defendant accurately that he did not have to consent, that his consent had to be given freely and voluntarily, and that, if child-pornographic images were found, he would not be arrested that day but would be liable for federal prosecution. He clarified that child pornography encompasses not only images depicting sexual activity but also images of the lascivious display of genitals. The defendant twice asked what would happen if he did not consent, once before and once after he made the admissions that McDonnell believed conferred probable cause for issuance of a warrant to search the computer. On the first occasion, McDonnell advised him that, if he were in his shoes and had nothing to hide, he would consent to the search. While on that occasion McDonnell chose to encourage the defendant to consent rather than to reveal that he then lacked probable cause to seek a warrant, the remark was not coercive in the circumstances. It was presented as a personal opinion, not a threat, promise, or directive, and was responsive to the position that the defendant then was taking that the only images he had seen of children on web sites were of their faces. In any event, the defendant was not sufficiently swayed by the comment to sign the consent form at that time.

On the second occasion, following the defendant's admissions, McDonnell advised him truthfully that, if he did not consent, McDonnell would secure the computer and apply for a search warrant. The First Circuit has held that "an officer's statement that he will 'obtain other means' to seize evidence is not the same as saying that he is presently entitled, without the 'other means,' to the evidence. . . . Nor is there anything false or unduly coercive about a statement of an intention to seek other means to obtain access to property." *Perez-Montañez*, 202 F.3d at

438-39.[13] McDonnell did not begin to run the pre-search software until the defendant finally signed the written consent form.

In short, the facts of this case, as I have recommended they be found, point not to police extraction of a suspect's involuntary consent, but rather to a knowing and voluntary decision to consent made after a well-educated and intelligent defendant carefully read a written consent form and asked a number of questions, to which police gave truthful answers, in an attempt to make a fully-informed decision. Nothing else about the circumstances calls into question the voluntariness of the defendant's consent. He was approached at a reasonable hour, in the familiar surroundings of his own home, by two plainclothed agents, one of whom was smaller than he, and the other of whom was not appreciably larger. While the agents wore visible firearms, they never unholstered them, threatened the defendant or raised their voices. Nor, apart from a relatively innocuous direction to log on to his computer and sit on his bed, given after the defendant had already orally agreed to permit agents to search the computer and led them to its location, did either agent direct him to do anything or restrict his movement. In fact, while the pre-search program was running after he had given his consent, the defendant felt free to leave the bedroom to obtain smoking materials. Although the agents' car was parked in such a way as to block that of the defendant, the defendant felt that he probably could have driven his car around it if he had been inclined to do so.

---

[13] Even if I were to credit the defendant's testimony that McDonnell said he would "get a search warrant" if the defendant did not consent, the result would be no different. In *United States v. Marshall*, 348 F.3d 281 (1st Cir. 2003), a case in which the district court chose not to credit the defendant's roommate's testimony that officers told her they would search her apartment even if she did not consent "because they were going to get a search warrant[,]" the First Circuit observed that even if the roommate's testimony were credited, the finding of no coercion would survive court review. *Marshall*, 348 F.3d at 286. The First Circuit noted: "[T]he fact that the officers told her that they were going to search the apartment regardless of whether she consented because they intended to get a warrant is not inherently coercive. Probable cause had been established and the officers had a good faith belief that a warrant would issue." *Id*.

For all of these reasons, I conclude that the defendant freely and voluntarily consented to the search of his computer on August 24, 2004.

### B.  Admissibility of Statements

The defendant also seeks to suppress his statements on the bases that they were elicited involuntarily and in the absence of a *Miranda* warning.  *See generally* Reply.

Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments.  *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002).  In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will.  *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940).  As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).  *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged.  The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted).  Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id*.

(citation omitted). The determination whether there was such a restraint on freedom of movement hinges "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323. *See also United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted).

"Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted). "A suspect is usually not in custody in his home when officers merely want to speak with him." *Ponce Munoz*, 150 F. Supp.2d at 1133. "However, 'custody' for *Miranda* purposes may occur in one's home if the suspect is subject to the functional equivalent of arrest." *Id.*

For the same reasons that I find the defendant's consent to have been given voluntarily, I conclude that his statements were made voluntarily. Neither McDonnell's remarks to the defendant, nor the agents' behavior while at his residence, were abusive or coercive. Nor was the defendant "in custody" for *Miranda* purposes, in the sense that he was subject to the functional equivalent of arrest. He was never arrested, told that he would be placed under arrest, touched, or directed not to leave. Indeed, in response to a question, he was assured that he would not be placed under arrest that day, and he was not.

### III. Conclusion

For the foregoing reasons, I recommend that the Motion be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 25th day of August, 2008.

                                        /s/  John H. Rich III
                                        John H. Rich III
                                        United States Magistrate Judge